**FILED**

JAMES J. VILT JR,
CLERK

4/22/2026

U.S. DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY**

**R.B., S.C., J.S., and J.F.** on behalf of themselves and on behalf of all others similarly situated,

       Plaintiffs,

v.

**Baptist Healthcare System, Inc.,**

       Defendant.

Case No. 3:26CV-295-CHB

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiffs R.B., S.C., J.S., and J.F. ("Plaintiffs")[1] at all times relevant herein have been patients at Baptist Healthcare System, Inc.'s ("Baptist" or "Defendant") hospitals and/or clinics. Plaintiffs bring this class action lawsuit against Defendant in their individual capacities and on behalf of all others similarly situated, and allege upon personal knowledge as to their own actions, their counsels' investigation, and upon information and belief as to all other matters, as follows:

---

[1] Plaintiffs bring this putative class action lawsuit anonymously out of a desire to protect their protected health information under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and Kentucky law.

1

## I.    INTRODUCTION

1.    Plaintiffs bring this class action lawsuit to address Defendant's unlawful practice of disclosing Plaintiffs' and the putative class members' ("Class" or "Class Members") confidential communications, personally identifiable information ("PII"), and protected health information ("PHI") (collectively referred to as "Private Information") to unauthorized third parties—including Google LLC, its affiliates, or its subsidiaries (collectively, "Google"); Microsoft Corporation, its affiliates, or its subsidiaries (collectively, "Microsoft"); and Adobe Inc., its affiliates, or its subsidiaries (collectively, "Adobe," and together with Google and Microsoft, "Unauthorized Parties")— without their consent, through the use of tracking software that is embedded in Defendant's website.

2.    Information about a person's physical and mental health is among the most confidential and sensitive information in our society, the mishandling of which can have serious consequences, including discrimination in the workplace or denial of insurance coverage. In recognizing the sensitive and private nature of such medical information, state and federal legislators enacted multiple laws and regulations aimed at keeping this information confidential, including HIPAA.

3.    Defendant owns and controls www.baptisthealth.com/ ("Defendant's Website" or the "Website"), which it encourages patients to use to search

for physicians and medical facilities, explore health services, pay for care, access their patient portal, and register for support groups, courses, and other programs. In doing so, visitors frequently input sensitive Private Information, including private and confidential information related to their health conditions, treatment, and medical care needs.

4. Unbeknownst to visitors of Defendant's Website, including Defendant's patients, while using these online services, Baptist surreptitiously intercepts patients' communications using the Unauthorized Parties' code embedded on the Website ("Tracking Tools") and transmits their Private Information to Unauthorized Parties *without their consent*. This information includes but is not limited to: (i) the locations or facilities where visitors or patients are seeking treatment; (ii) the types of medical services or procedures visitors or patients are seeking; (iii) search queries entered by visitors or patients into the website's search bar; and (iv) patients' access to the patient portal.

5. As a result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) diminution of value and loss of control of their Private Information; (iv) statutory damages; and (v) the continued and ongoing risk to their Private Information.

6.     Plaintiffs seek to remedy these harms and bring causes of action for (i) violations of the Electronics Communication Privacy Act ("ECPA"), 18 U.S.C. § 2511(1)—unauthorized interception, use, and disclosure; (ii) breach of confidence; (iii) invasion of privacy (intrusion upon seclusion); (iv) unjust enrichment; and (v) breach of implied contract.

## II.     THE PARTIES

7.     Plaintiff **R.B.** is a natural person and citizen of Illinois where she intends to remain.

8.     Plaintiff **S.C.** is a natural person and citizen of Kentucky where she intends to remain.

9.     Plaintiff **J.S.** is a natural person and citizen of Kentucky where she intends to remain.

10.     Plaintiff **J.F.** is a natural person and citizen of Kentucky where she intends to remain.

11.     Defendant **Baptist Healthcare, Inc.** is a not-for-profit healthcare provider with locations in Kentucky, Indiana, and Illinois. Defendant has an annual revenue of approximately $4 billion. Defendant's principal place of business is in Louisville, Kentucky. Its registered agent is Janet M. Norton, located at 1901 Campus Place, Louisville, Kentucky 40299.

12.     Defendant is covered entity under HIPAA, 42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164.

13. All of Plaintiffs' claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents, and/or assigns.

### III. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, there are more than one hundred (100) members in the proposed class, and at least one (1) member of the class is a citizen of a state different from Defendant.

15. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, *et seq.*).

16. This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

17. Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

### IV. COMMON FACTUAL ALLEGATIONS

#### A. Third-Party Trackers on Healthcare Websites.

18. Consumer tracking technologies have begun to creep their way

across the internet, including on healthcare websites. Healthcare entities *must* obtain their patients' informed consent to use these technologies, as these sophisticated Tracking Tools enable third-party advertisers and technology giants to collect users' personal data, communications, and online activities for profit.

19.     Without consent, Defendant has knowingly embedded these sophisticated tracking technologies on its Website, causing its patients' sensitive communications and online activity, including Private Information, to be transmitted to the Unauthorized Parties without consent.

20.     To understand Defendant's unlawful data-sharing practices, it is important to first understand basic web design and the function of common Tracking Tools.

21.     Devices (such as computers, tablets, or smart phones) access web content through a web browser (*e.g.*, Google's Chrome browser and Microsoft's Edge browser).

22.     Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with users via web browsers.

23.     Web communications consist of HTTP or HTTPS requests and HTTP or HTTPS responses, and any given browsing session may consist of

6

thousands of individual HTTP(S) requests and HTTP(S) responses, along with corresponding cookies:

- **Universal Resource Locator ("URL")**: a web address.[2]

- **HTTP Request**: electronic communication sent from the client's browser to the website's server. GET requests are one of the most common types of HTTP requests. In addition to specifying a particular URL, GET requests can also send data to the host server embedded inside the URL, and can include cookies.[3]

- **Cookies**: a small text file that can be used to store information on the client device, which can later be communicated to a server or servers. Cookies are sent with HTTP requests from client devices to the host server. Some cookies are "third-party cookies," which means they are not required for the functioning of the website (in contrast to "first-party" cookies), and can store

---

[2] https://www.oppl.org/news-events/digital-learning/tech-tips-what-is-a-url/; *see also* https://developer.mozilla.org/en-US/docs/Learn_web_development/Howto/Web_mechanics/What_is_a_URL (last visited March 20, 2026).

[3] https://aws.amazon.com/compare/the-difference-between-https-and-http/; *see also* https://www.codecademy.com/article/what-is-http (last visited March 20, 2026).

and communicate data to websites beyond the page visited by the user. [4]

- **HTTP Response**: an electronic communication that is sent as a reply to the client's web browser from the host server in response to an HTTP request. HTTP responses may consist of a web page, another kind of file, text information, or error codes, among other data.[5]

24.    Every website is comprised of "markup" (described below) and "source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source code is essentially the back of the website, and the user does not see what happens in the source code.

25.    Source code may also command a web browser to send data to third parties through HTTP requests that are invisibly executed in the background without notifying the person using the web browser. For example, the Tracking Tools in this case are snippets of code that Defendant embedded in its Website's source code, thereby instructing a user's browser to send transmissions to Unauthorized Parties' own web servers.

---

[4] https://www.ftc.gov/policy-notices/privacy-policy/internet-cookies (last visited March 20, 2026).
[5] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

26.    By contrast, the Markup[6] is the façade of the website, and it is the only part that website visitors actually see when they access a website. For example, a patient's HTTP request seeks specific information from the Defendant's Website (*e.g.*, "Find a Provider" page), and the HTTP Response provides the requested information in the form of "Markup," forming the webpage's content and features.

27.    Similarly, when a patient visits www.baptisthealth.com/ and selects the "Find a Provider" button, their web browser automatically sends an HTTP request to Defendant's web server. Defendant's web server automatically returns an HTTP response, which loads the markup for that particular webpage. As pictured below, patients only see the markup, not Defendant's source code or underlying HTTP requests and responses:[7]

---

[6] *See* https://zeronoisemarketing.com/what-does-markup-mean-in-website-design/ (last visited March 20, 2026).

[7] Baptist Health, *Find a Provider*, https://www.baptisthealth.com/providers (last visited on Nov. 30, 2025).



*Figure 1. The image above is a screenshot taken from a web browser upon visiting* https://www.baptisthealth.com/providers. *The red boxes have been added for emphasis and clarification.[8]*

28.    When a user visits the Website, their browser sends an HTTP request to the Website's server to load the page. In response, the server sends back the webpage, which may contain a small piece of code known as a

---

[8] All images and screenshots herein are for illustration purposes only.

"tracker," or a "pixel."[9]

29. The Tracking Tools are scripts that run in the background and collect information about the user. The Tracking Tools instruct the browser to send the user's IP address, along with other identifying data like cookies, browser details, and device information, as well as the user's inputs on the Website, to third-party trackers like the Unauthorized Parties. This allows the embedded Tracking Tools to monitor user activity, intercept communications, and gather insights about the users' behavior on the Website.

30. Technology companies, like the Unauthorized Parties, offer Tracking Tools as software that entities, including healthcare providers such as Defendant, can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user communications and activity on those platforms.

31. These Tracking Tools are typically offered to entities like Defendant for "free." In fact, however, they are provided by the Unauthorized Parties at no additional monetary costs in exchange for Defendant's patients' data.

32. The Tracking Tools are used to gather, identify, target, and market

---

[9] https://en.ryte.com/wiki/Tracking_Pixel/; *see also* https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited March 20, 2026).

products and services to Defendant's patients.

33.     When a user accesses a webpage that is hosting Tracking Tools—like Defendant's Website—their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to the Unauthorized Parties without consent. As a result, Unauthorized Parties intercept what patients communicate to Defendant via Defendant's Website and/or Defendant's patient portal hosted by the website. Notably, these unauthorized transmissions only occur on webpages that contain Tracking Tools. Thus, Plaintiffs' and Class Member's Private Information would not have been disclosed to Unauthorized Parties via this technology but for Defendant's deliberate and intentional decision to install the Tracking Tools on its Website.

34.     The Unauthorized Parties that receive patient communications via Tracking Tools do not provide any substantive website content relating to the user's communications. Instead, they harvest user data and communications for the website owner's marketing purposes (i.e., to bolster profits) and for their own benefit (i.e., to sell advertising tools to third parties).

**B. The Department of Health and Human Services ("HHS") and Federal Trade Commission ("FTC") Have Issued Warnings About the Use of Tracking Tools by Healthcare Providers and Resulting HIPAA Violations.**

35.     Baptist's conduct and use of the Tracking Tools is contrary to federal regulatory rules and is in violation of HIPAA.

36.    In January 2013, HHS issued a final rulemaking notice regarding modifications to the HIPAA privacy, security, enforcement, and breach notification rules under the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act") to "strengthen the privacy and security protection for individuals' health information."[10]

37.    As part of that final rulemaking, which became effective on March 26, 2013, HHS stated that, to be considered PHI under HIPAA, PHI did "not necessarily [need to] include diagnosis-specific information, such as information about the treatment of an individual."[11] Instead, "[i]f the information is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity, and therefore it must be protected … in accordance with the HIPAA rules." *Id.*

38.    In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of Tracking Tools on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing***

---

[10] 78 Fed. Reg. 5566 (January 25, 2013).
[11] 78 Fed. Reg. at 5598.

> ***purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[12]

In other words, HHS has expressly stated that entities like Defendant that use Tracking Tools—and disclose patient information to Unauthorized Parties in the process of using these Tracking Tools such as Defendant—have violated HIPAA unless those entities obtain a HIPAA-compliant authorization.

39.    The HHS Bulletin further warns that:

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[13]

40.    Additionally, HHS has warned healthcare providers that PHI and PII is not limited exclusively to patient portals or specific website pages, and thus Defendant still has an obligation to protect information on non-password protected (*i.e.*, "unauthenticated") webpages.

41.    Citing to the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (*i.e.*, that is indicative that the individual has received or will receive health care services

---

[12] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis added).
[13] *Id.*

or benefits from the covered entity) … relates to the individual's past, present, or future health or health care or payment for care."[14]

42. The HHS Bulletin went on to state:

> Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. ***For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.***[15]

43. In addition, HHS and the FTC jointly issued a letter, once again admonishing and directing entities like Defendant to stop using Tracking Tools:

> If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium. ***The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (e.g., tracking technology vendors) includes PHI. . .*** Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health

---

[14] *Id*.
[15] *Id*. (emphasis added).

15

information under the FTC Act and the FTC Health Breach Notification Rule. . . As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app. The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[16]

44.    Despite this guidance and HIPAA's requirements, Baptist intended to, and did, share and monetize Plaintiffs' and the Class Members' Private Information in violation of HIPAA.

45.    Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patient's ***express written*** authorization.[17]

46.    An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually

---

[16] *Re: Use of Online Tracking Technologies*, U.S. Dept. of Health & Hum. Servs. and Fed.      Trade.      Comm'n      (July      20,      2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackings-07-20-2023.pdf.

[17] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual ***obtained or disclosed*** such information without authorization." 42 U.S.C. § 1320d-6.

47. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it knowingly obtains and discloses individually identifiable health information relating to an individual, as those terms are defined under HIPAA, to the Unauthorized Parties

**C. Defendant Disclosed Plaintiffs' and Class Members' Private Information to Unauthorized Parties.**

48. In this case, Defendant employed Tracking Tools to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to Unauthorized Parties.

49. The Tracking Tools secretly instructed patients' browsers to intercept and duplicate the patients' communications with Defendant (in real time) and to send those communications to Unauthorized Parties. These transmissions occurred contemporaneously, invisibly, and without the patients' knowledge. The Tracking Tools are not mere "session replay"[18] technology, but, as described herein, capture the substance and meaning of users' communications with Defendant on the Website.

---

[18] https://www.datadoghq.com/knowledge-center/session-replay/.

50.    Thus, without its patients' consent, Defendant has effectively used its source code to embed Tracking Tools that commandeer and "bug" or "tap" into its patients' computing devices, allowing the Unauthorized Parties to listen in on or view Plaintiffs' and Class Members' communications with Defendant and intercept those communications, including the Private Information contained therein.

51.    This intercepted information can easily be traced back to the user. The Tracking Tools intercept the user's communications along with their IP address and unique digital identifiers. Moreover, when the user is logged into their accounts, like their Google accounts, when using Baptist's website, identifiers are transmitted to the Tracking Tools that can link users to their account information.

### i.    *Google*

52.    Google collects user data through services such as DoubleClick, which is part of the Google's marketing platform. DoubleClick automates ad buying and enables advertisers to place tracking codes on websites. By collecting information through DoubleClick, including PHI, the Google marketing platform allows entities to generate targeted ad campaigns to the website user.

53.    Google runs one of the largest online advertising platforms in the world, earning more than $200 billion in annual revenue, largely from targeted

advertising. The company's business model relies heavily on gathering extensive user data across its wide range of products and services—such as Google Search, Gmail, YouTube, and Android—which it uses to deliver highly personalized ads.

54.    DoubleClick, a digital advertising company acquired by Google, has been fully integrated into Google's advertising ecosystem as part of Google's marketing platform. DoubleClick technologies automate the ad buying process and use collected data for targeted advertising initiatives.

55.    DoubleClick enables advertisers to integrate tracking codes into their websites. The data collected, combined with information from HTTP requests, helps create targeted ads.

56.    Moreover, Google builds independent user profiles, allowing advertisers to optimize targeting even without relying on users' existing Google accounts.

57.    DoubleClick is an advertising tracking tool designed to collect information about user behavior on websites in order to improve the targeting and effectiveness of advertising campaigns. DoubleClick builds independent user profiles to optimize ad targeting without relying on pre-existing Google accounts. Through the DoubleClick tracker, Google creates and assigns unique identifiers to website visitors, including through the use of "IDE" cookies.

58. The "IDE" cookie identifier, used to display ads, plays a key role in tracking users' interactions across the web. It helps measure the effectiveness of advertisements by tracking actions users take after viewing or clicking on an ad, such as making a purchase or visiting specific pages.

59. Google collects and stores the information DoubleClick obtains, including the "IDE" cookie (which is used to identify an individual, as each IDE cookie is unique for each user), IP addresses, and other cookies that uniquely identify browsers.

60. Google also collects and stores the "DSID" Google DoubleClick cookie. This cookie is used to identify users who are signed into their Google accounts and enables ads to follow the user to other sites, and violates privacy as Defendant's notices lack transparency and users, such as Plaintiffs and the Class, often have no control over the data collected. Administrators must implement informed consent to comply with privacy laws.[19]

61. Once deployed DoubleClick trackers load instantly whenever a user visits a page containing their source code. The Tracking Tool scripts run silently in the background, with no visible indication to the user, rendering them undetectable to ordinary website visitors. Only those with technical expertise—such as individuals who inspect the page's source code or use

---

[19] https://captaincompliance.com/education/dsid-cookie-description/.

specialized browser tools—may notice the presence of these trackers and the interception of their communications by Google. Because of this hidden operation, most users remain unaware that their electronic communications are being captured by third parties like Google.

62. As Google obtains the IDE cookie and IP addresses it can associate this information with a specific user, because Google is accessing individuals' Private Information via the Website.

63. Additionally, when users are logged into their Google accounts, the DSID cookie allows users' Private Information to be associated with the user's Google accounts.

### ii. Microsoft

64. Additionally, Baptist discloses patients' Private Information, along with users' Microsoft ID (Machine Unique Identifier, or "MUID")[20], to Microsoft via Microsoft's Clarity and Bing tracking software.

65. Microsoft is one of the world's largest technology companies, headquartered in Redmond, Washington. Among other products and services, Microsoft collects user data through services such as Microsoft Clarity and Microsoft Bing. Microsoft's platform reaches hundreds of millions of users

---

[20] See https://cyberlaw.stanford.edu/blog/2011/08/tracking-trackers-microsoft-advertising/ ("Microsoft's targeted advertising opt-out button was invisible in Chrome and Safari…. Microsoft's approach to segregating advertising data does not meaningfully protect user privacy.") (last visited March 25, 2026).

21

globally and processes extensive personal data to enable behavioral targeting and advertising optimization.

66.    Microsoft Clarity ("Clarity") is an analytics tool that provides insight into user behavior on a website through features like heatmaps and session recordings. Clarity tracks users' interaction with the website, identifying what users click on, what they ignore, how far they scroll, and what information they input into the website.

67.    Microsoft Bing ("Bing") is a web search engine developed by Microsoft that allows users to find information online. Bing is connected to Microsoft's search advertising network through Universal Event Tracking ("UET").[21]

68.    Both Clarity and Bing use tracking technologies to gather information that can later be used for analysis and targeted ads.

69.    Website owners integrate Bing's tracking abilities by adding a snippet of code into their website's source code. Once embedded, Bing's tracker loads automatically and immediately whenever a user visits a page containing the source code. The tracking code executes in the background without any

---

[21] *See* https://pandectes.io/blog/microsoft-consent-mode-understanding-universal-event-tracking-uet/ ("businesses have the ability to customize the way UET tags operate based on an individual user's consent status.") (last visited March 25, 2026).

visible indication to the user, making it completely invisible to ordinary website visitors.

70. Once activated, Bing's tracker immediately collects and transmits data to Microsoft about user actions, along with unique identifiers. This includes, but is not limited to: IP address, browser information, referring URLs, page visited, form submissions, search queries, and other user interactions with a website.

71. When a user visits a website that uses Clarity or Bing (such as Baptist's Website), information about their actions on the site, such as which pages they view, where they click, and how they scroll, is automatically sent to Microsoft. This data is sent with a special identifier, i.e., the MUID.

72. To enable user recognition across sessions and different (and even unrelated) websites, Bing's tracker assigns each browser a MUID, stored as a persistent cookie. This MUID is a unique identifier placed on a user's browser that collects information about the user, which is later used for targeted advertising, site analytics, and other operational purposes. The MUID typically lasts for approximately thirteen (13) months, unless the user clears their cookies, at which point a new identifier is generated.

73. The persistent nature of the MUID cookie enables Microsoft to track users continuously across multiple browsing sessions and different websites. Through this mechanism, Microsoft can create a comprehensive

record of browsing activity associated with a single user over time, even if the user's IP address changes between website visits (for instance, when accessing the website from different locations). Microsoft uses the browsing information collected by Bing's tracker and associated with the MUID cookie for targeted advertising.

74.    The MUID constitutes PII because it uniquely identifies a specific browser and enables Microsoft to track that browser's activities across multiple sessions and locations. When combined with the health-related searches and medical information collected from healthcare websites like Baptist's, this persistent identifier allows Microsoft to build detailed profiles of users' medical conditions, treatment interests, and healthcare needs.

75.    As Microsoft obtains this cookie and can associate the MUID cookie with a specific user, Microsoft is accessing individual's Private Information via Clarity and Bing.

### iii.    Adobe

76.    Adobe is a software company that provides digital media and marketing services. Adobe's technology tracks user information through methods such as web and app usage tracking, third-party sources, and directly analyzing users' content. This information is collected automatically through cookies and software processes, or manually when individuals fill out forms online or log into their accounts.

24

77.    Amongst these services, Adobe offers the Adobe Experience Platform Edge Network (the "Edge Network")—a real-time data collection service and a core component of Adobe's tracking infrastructure. The Edge Network is activated through the domain edge.adobedc.net, which appears in browser URL requests when the tool is in use.



*Figure 2*. *The image above is a screenshot of a network request to* edge.adobedc.net, *illustrating the activation of Adobe's Edge Network and real-time user data collection.*

78.    The Edge Network collects user interactions from various websites (including Baptist's Website) and transmits them to Adobe's services.

79.    Adobe's Edge Network assigns each user a persistent identifier called an Experience Cloud ID ("ECID"), which allows Adobe to recognize individuals across sessions, devices, and channels, even when they are not logged in. ECID is a unique identifier by itself as it is unique to each individual.

25

Moreover, an individual's ECID is often linked with other persistent identifiers through Adobe's system to build a centralized profile for each user.



*Figure 3. The image above is a screenshot of a HTTP request, showing Adobe's use of a persistent user identifier (ECID) via the Edge Network.*

80.    Adobe uses the ECID to create an "Identity Graph" for individual users. Adobe's Identity Graph is a map of relationships between different identities for a particular customer, providing companies with a visual representation of how the user interacts with the brand across different channels and platforms. The Identity Graph links ECIDs with additional identifiers such as emails, phone numbers, Google accounts, Customer Relationship Management ("CRM") records,[22] and a customer's loyalty ID

---

[22] CRM records are data sets within a CRM system that stores and organizes all information about a customer, such as contact details, purchase history, interactions with a company, and customer preferences.

number.[23] This technology creates a user profile across different platforms and devices.[24]



***Figure 4****. The image above is a screenshot taken from a web browser upon visiting* https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/identity-graph-viewer.

81.     For first-time website visitors, Adobe's technology creates a unique ECID and sends and stores that information on the Edge Network.

82.     For returning visitors, Adobe's tracking technology is able to pull an individual's ECID (and other information) by using a browser cookie called

---

[23] Loyalty ID numbers are unique identifiers (like a number or barcode) used to identify a customer within a business's loyalty program. It can be on a physical card, a digital card in a mobile app, or even a number associated with an account, allowing businesses to track customer purchases/involvement.

[24] *Identity Graph Viewer*, Adobe Experience League (Apr. 1, 2025) https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/identity-graph-viewer.

"kndctr_{ORG_ID}_AdobeOrg_identity." This cookie allows Adobe to persistently identify and track returning visitors across sessions and pages.

83.    If an individual accesses a website using an anonymous ID and later logs into a website, Adobe's Edge Network links the anonymous ID with the user's profile.[25]



***Figure 5***. *The image above is a screenshot taken from a web browser upon visiting* https://experienceleague.adobe.com/en/docs/experience-platform/identity/home.

84.    The information collected, including the ECID, is used to create targeted advertising. Adobe's other software and technologies, such as the

[25] *Adobe Experience Platform Identity Services*, Adobe Experience League (Nov. 24, 2025)                   https://experienceleague.adobe.com/en/docs/experience-platform/identity/home.

Adobe Audience Manager, use this information as a core identifier to build behavioral audience segments and activate them across ad platforms.

85.    ECID is not merely used for analytics or site functionality, it is a core mechanism enabling behavioral advertising. The presence of ECID in data flows to edge.adobedc.net, combined with its documented role in cross-device identification and advertising, demonstrates a system designed for persistent, profile-based tracking.[26]

### iv.    *Visitors' Activities on Baptist's Website are Shared with Unauthorized Parties.*

86.    When patients interact with Baptist's Website, their Private Information is intercepted by Unauthorized Parties without their consent through undisclosed Tracking Tools.

87.    Upon entering Defendant's Website homepage, visitors may select from options such as "Find a Location," "Find a Provider," and "Make an Appointment," all prominently displayed on the Website menu, as pictured below:[27]

---

[26] *See* https://experienceleague.adobe.com/en/docs/platform-learn/implement-web-sdk/consent-management/setup-consent (distinguishing implied opt-in and implied opt-out options for businesses such as Defendant to implement).

[27] Baptist Health, https://www.baptisthealth.com/ (last visited on November 30, 2025).



**Figure 6**. *The image above is a screenshot taken from a web browser upon visiting* https://www.baptisthealth.com.

88.    Once visitors search for providers, locations, or services, their searches are intercepted by the Tracking Tools and shared with Unauthorized Parties.

89.    When searching for Baptist providers, visitors can filter by provider type, specialty, location, age groups seen, and more.

90.    In the example below, Tracking Tools on Baptist's Website intercepted the communication by the user and transmitted information to Unauthorized Parties that the user had searched for an English-speaking physician, specializing in neurosurgery in Illinois, who sees adults 65 and older.

30



***Figure 7****. The image above displays what the user sees when searching for a "Neurosurgery" provider in "Illinois, USA"*

91.    These search terms and parameters are input by the users, such as Plaintiffs and Class Members, and transmitted to the Unauthorized Parties along with a unique cookie value for that user, depending on the Tracking Tool used, as well as other identifying information such as IP addresses and device information.



*Figure 9*. *The image above displays what information Baptist transmits to Google through Doubleclick*



*Figure 10*. *The image above displays what information Baptist transmits to Microsoft through Clarity*

32



***Figure 11***. *The image above displays what information Baptist transmits to Microsoft through Bing*



***Figure 12***. *The image above displays what information Baptist transmits to Adobe*



***Figure 13****. The image above shows that Adobe's request [Fig. 12] contains an ECID identifier*

92.     These Tracking Tools even divulge, word for word, the exact text and phrases patients typed into the general search bar located on Defendant's Website. This information is transmitted in the form of a URL string transmitted in the GET request to the Unauthorized Parties, which identify the terms searched.

93.     Similarly, when users search for a provider using a ZIP code, the ZIP code information is shared by Defendant to the Unauthorized Parties.

94.     Once a user selects or "clicks on" a physician, the user is taken to the physician's page. At the same time, the Tracking Tools transmit this information to the Unauthorized Parties.



*Figure 14. The image above is what users see after they select a provider*

95.    The  transmitted  information  includes  the  physicians  name  and specialty—information specifically selected or entered by the user.



**Figure 15**. *The image above displays what information Baptist transmits to Google through Doubleclick*

36



*Figure 16*. *The image above displays what information Baptist transmits to Microsoft through Clarity*



*Figure 17*. *The image above displays what information Baptist transmits to Microsoft through Bing*



**Figure 18**. *The image above displays what information Baptist transmits to Adobe*



**Figure 19**. *The image above shows that Adobe's request [Fig. 18] contains an ECID identifier*

96.     When using the "Find a Location" page, visitors can search by department, service, condition, or treatment, and such information is transmitted to the Unauthorized Parties. For example, a search for a "Behavioral Health Clinic" specializing or offering "psychiatry," would be intercepted by the Tracking Tools and transmitted to Unauthorized Parties.

97.     A user's click on "Schedule an Appointment" and the time and provider selected is also transmitted to Unauthorized Parties. When a user clicks the call option on Baptist's Website and attempts to make a phone call to the physician's office, this information is also transmitted to Unauthorized Parties. Similarly, clicks navigating users to the patient portal login page from the Website are captured and transmitted to the Unauthorized Parties.

98.     In addition, any information entered by a visitor into the search bar on the Website's homepage is intercepted via the Tracking Tools, such as a search for "pregnancy," which would be transmitted as data to the Unauthorized Parties, along with identifying cookie values of that user.

99.     Baptist's Website also transmits patients' IP addresses to Google, Microsoft, and Adobe. As shown in the images below, each network request initiated by Baptist's Website includes the patient's IP address as the source of the transmission. The inclusion of the IP address—a persistent identifier that can be and is linked to an individual or household—making the user easily

39

identifiable and enabling third parties (including the Unauthorized Parties) to

track and profile them across sessions and platforms.

*Figure 20. The image above displays what information Baptist transmits to Google through Doubleclick*

*Figure 21. The image above displays what information Baptist transmits to Microsoft through Clarity*

*Figure 22. The image above displays what information Baptist transmits to Microsoft through Bing*

41

```
[Header checksum status: Unverified]
Source Address: 10.5.0.2
Destination Address: 63.140.38.204
[Stream index: 10]
ransmission Control Protocol, Src Port: 60834, Dst Port: 443, Seq: 2154, Ack: 3098, Len: 545
ransport Layer Security
yperText Transfer Protocol 2
 Stream: HEADERS, Stream ID: 1, Length 514, POST /ee/va6/v1/interact?configId=2ecdd074-0c40-4fb1-9907-3ccbe15613d8&requestId=67414791-186d-47c4-9cf5-fef06c20d9c1
   Length: 514
   Type: HEADERS (1)
 > Flags: 0x24, Priority, End Headers
   0... .... .... .... .... .... .... .... = Reserved: 0x0
   .000 0000 0000 0000 0000 0000 0000 0001 = Stream Identifier: 1
   [Pad Length: 0]
   1... .... .... .... .... .... .... .... = Exclusive: True
   .000 0000 0000 0000 0000 0000 0000 0000 = Stream Dependency: 0
   Weight: 219
   [Weight real: 220]
   Header Block Fragment [...]: 83418b2c931571c878cb2117a8a98704d060a563b8dc63b85835492d83227fc21ea94d3649201149248075a5804680b352c6159f7c0eacc9091942db816647be2c2f6b4a84
   [Header Length: 907]
   [Header Count: 21]
 > Header: :method: POST
 > Header: :authority: edge.adobedc.net
 > Header: :scheme: https
 > Header: :path: /ee/va6/v1/interact?configId=2ecdd074-0c40-4fb1-9907-3ccbe15613d8&requestId=67414791-186d-47c4-9cf5-fef06c20d9c1
 > Header: content-length: 1871
 > Header: cache-control: max-age=0
 > Header: sec-ch-ua-platform: "macOS"
 > Header: user-agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.0.0 Safari/537.36
 > Header: sec-ch-ua: "Not)A;Brand";v="8", "Chromium";v="138", "Google Chrome";v="138"
 > Header: content-type: text/plain; charset=UTF-8
 > Header: sec-ch-ua-mobile: ?0
 > Header: accept: */*
 > Header: origin: https://www.baptisthealth.com
 > Header: sec-fetch-site: cross-site
 > Header: sec-fetch-mode: cors
 > Header: sec-fetch-dest: empty
 > Header: sec-fetch-storage-access: active
 > Header: referer: https://www.baptisthealth.com/
 > Header: accept-encoding: gzip, deflate, br, zstd
 > Header: accept-language: en-US,en;q=0.9
```

*Figure 23. The image above displays what information Baptist transmits to Adobe*

100.   Defendant failed to disclose that its Website embeds Tracking Tools that track, intercept, record, and transmit patients' Private Information to Unauthorized Parties, and Plaintiffs and Class Members were unaware of these practices when they used the Website in connection with their ongoing medical care and treatment.

101.   By combining the information submitted through the Website with the Unauthorized Parties' cookies, the Tracking Tools intercept the user's communications and transmit them to the Unauthorized Parties, allowing them to identify the individual user with their sensitive communications and Private Information.

42

102. Defendant's use of Tracking Tools intercepted patients' communications to Defendant, in real time, and sent the Private Information to the Unauthorized Parties, including but not limited to Plaintiffs' and Class Members': (i) status as medical patients; (ii) health conditions; (iii) desired medical treatment or therapies; (iv) desired locations or facilities where treatment was sought; (v) phrases and search queries (such as searches for symptoms, treatment options, or types of providers); (vi) searched and selected physicians and their specialties conducted via the general search bar; and (vii) access to their patient portal.

103. Defendant deprived Plaintiffs and Class Members of their privacy rights when it: (i) implemented Tracking Tools that surreptitiously tracked, recorded, and disclosed Plaintiffs' and other online patients' confidential communications and Private Information; (ii) disclosed patients' protected information to Unauthorized Parties; and (iii) undertook this pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their consent.

**D. Baptist Patients Have a Reasonable Expectation of Privacy.**

104. Baptist patients believed that their Private Information communicated on the Website would not be shared with third parties without their consent. At no time did Baptist provide sufficient notice or receive consent

43

from Plaintiffs for its conduct, *i.e.*, procuring the interception of its patients' Private Information.

105. Plaintiffs and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

106. Indeed, at all times when Plaintiffs and Class Members provided their Private Information to Defendant, they each had a reasonable expectation that their Private Information would remain private and that Defendant would not share the Private Information with Unauthorized Parties for a commercial purpose unrelated to patient care. Moreover, Plaintiffs' and Class Members' activity on Defendant's Website is confidential because such activity relates to Plaintiffs' and Class Members' personal medical treatment, medical services, medical diagnosis, and/or medical information for which Plaintiffs and Class Members have a reasonable expectation of privacy and expectation that such activities will not be disclosed to Unauthorized Parties.

107. Plaintiffs and Class Members would not have used Defendant's Website, would not have provided their Private Information to Defendant, and would not have paid for Defendant's healthcare services, or would have paid less for them, had they known that Defendant would disclose their Private Information to Unauthorized Parties.

44

108. In fact, Baptist's Privacy Policy acknowledges that Baptist may only use or disclose certain private information (including PHI) if it obtains written consent from the patient.[28]

109. HHS's HIPAA guidance clarifies that any deployment of pixels, cookies, session-replay scripts, or similar code on healthcare sites is subject to HIPAA and may only be disclosed to tracking vendors under certain circumstances. Before such information can be shared, the healthcare organization (in this case, Baptist) must first sign a HIPAA-compliant Business Associate Agreement ("BAA") with the tracking vendor (in this case, the Unauthorized Parties). Moreover, HIPAA requires a valid legal basis for any disclosures, such as treatment-related purpose, or, if the disclosure falls outside the permitted categories, a written patient authorization. Without both a BAA and the requisite written authorization, disclosing this information to the Unauthorized Parties constitutes a HIPAA violation.

110. Further, Baptist promises its patients that "Baptist Health does not use [patients'] data for retargeting or remarketing."[29] In doing so, Baptist fails to make any mention of cookies, pixels, or other tracking tools that

---

[28] *See* https://www.baptisthealth.com/website-privacy-information/baptist-health-hospital-privacy-notice.

[29] https://www.baptisthealth.com/website-privacy-information/website-terms-of-use#:~:text=Baptist%20Health%20does%20not%20use%20your%20data%20for%20retargeting%20or%20remarketing.

45

transmit patients' PHI to the Unauthorized Parties whom it knew or should have known was using this information for marketing and/or non-healthcare related purposes.

111. Despite its promises, Baptist shares its patients' medical information with entities such as Google, Microsoft, and Adobe through personally identifiable cookies without disclosure or consent.

112. Baptist fails to comply with the requirements outlined in its own policies and HHS's HIPAA guidance concerning the use of tracking technologies.

113. Patients are not informed that the Website's source code includes third-party tracking software used for profiling and targeted advertising. There is no indication that Baptist has executed the mandatory BAAs with these vendors. There is also no indication that Baptist obtained informed consent through the HIPAA-required written authorizations for data collection unrelated to treatment, payment, or healthcare operations.

### E. Plaintiffs' Experiences.

#### i.    *Plaintiff R.B.'s Experience*

114. Plaintiff R.B. is a former patient of Defendant.

115. Plaintiff R.B. has received and paid for healthcare services from Defendant.

116. Plaintiff R.B. has used Defendant's Website and Patient Portal to communicate Private Information to Defendant on numerous occasions and to receive healthcare services from Baptist facilities, at Defendant's direction, and with Defendant's encouragement.

117. Plaintiff R.B. uses the Google Chrome internet browser on her mobile device and computer to access Baptist's Website.

118. Plaintiff R.B. has had a Google account for several years and remained logged into that account while using Defendant's Website.

119. Plaintiff R.B. used Defendant's Website and/or patient portal through her phone to conduct activities such as: (i) search for locations, doctors, and specialties, (ii) place a call through the Website, and (iii) book an appointment online.

120. Plaintiff R.B. was logged in to her Google account and Baptist Health portal/patient account when she searched for locations, doctors, and specialists, placed a call through the Website, and booked appointments online.

121. Specifically, Plaintiff R.B. used Defendant's Website to research OBGYNs and specialists under OBYGN. After using Defendant's Website for this purpose, Plaintiff R.B. saw medical ads online related to OBGYN services. The presence of these advertisements confirms Defendant's unlawful transmission of Plaintiff R.B.'s Private Information to Unauthorized Parties.

122. As Defendant's patient, Plaintiff R.B. reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted to or disclosed to Unauthorized Parties. But for her status as Defendant's patient, Plaintiff R.B. would not have disclosed her Private Information to Defendant via its Website.

123. At all relevant times, Plaintiff R.B. was unaware of the Tracking Tools on Defendant's Website and Defendant never disclosed to R.B. the use of such technology on Defendant's Website.

124. During her time as a patient, Plaintiff R.B. never consented to the use of her Private Information by Unauthorized Parties or to Defendant enabling Unauthorized Parties to access or intercept such information. However, Defendant's Website routinely provided Unauthorized Parties with patients' IP addresses, device IDs, persistent cookie identifiers, and/or user accounts or other information users input into Defendant's Website, like their home address, zip code, or phone number. This is precisely the type of information HIPAA requires healthcare providers to anonymize to protect patients' privacy. Plaintiff R.B.'s and Class Members' identities could be easily determined based on persistent cookie identifiers, IP address, and/or reverse lookup from the collection of other identifying information that Defendant improperly disclosed.

125. After Defendant's Tracking Tools on its Website intercepted and collected Plaintiff R.B.'s Private Information communicated to Defendant, the Tracking Tools transmitted it to the Unauthorized Parties, who processed it, analyzed it, and assimilated it into their own datasets and commercial products. Since Plaintiff R.B. is a Google user, Google has or will associate the information that it collects from R.B. to her Google account that identifies her name and other identifying information.

126. By using the Tracking Tools to intercept Plaintiff R.B.'s communications to Defendant and then transmitting that information to Unauthorized Parties, Defendant procured Unauthorized Parties to intercept Plaintiff R.B.'s communications while accessing Defendant's Website, including the contents thereof. Such communications included, but were not limited to, the URL visited, the medical conditions and types of doctors searched, and/or other medical information related to Plaintiff R.B.

127. In sum, the Tracking Tools on Defendant's Website intercepted Plaintiff R.B.'s highly sensitive communications and Private Information to Defendant and transmitted it to Unauthorized Parties, including search terms and communications that contained private and confidential information, without Plaintiff R.B.'s knowledge, consent, or express written authorization.

128. Plaintiff R.B. suffered injuries in the form of: (i) invasion of privacy; (ii) diminution of value and loss of control of her Private Information;

(iii) statutory damages; (iv) the continued and ongoing risk to her Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff R.B.'s medical information and other confidential information she communicated to Defendant via the Website.

129. Plaintiff R.B. has a continuing interest in ensuring that her future communications with Defendant are protected and safeguarded from future unauthorized disclosure, and she also has an interest in knowing which other unauthorized parties—aside from Unauthorized Parties—have received her Private Information since she first started using the Website.

### ii.    Plaintiff S.C.'s Experience

130. Plaintiff S.C. is a current patient of Defendant.

131. Plaintiff S.C. has received and paid for healthcare services from Defendant.

132. Plaintiff S.C. has used Defendant's Website and patient portal to communicate Private Information to Defendant on numerous occasions and to receive healthcare services from Baptist facilities, at Defendant's direction, and with Defendant's encouragement.

133. Plaintiff S.C. uses the Google Chrome internet browser on her mobile device and computer to access Baptist's Website.

134. Plaintiff S.C. has had a Google account for several years and remained logged into that account while using Defendant's Website.

135. Plaintiff S.C. used Defendant's Website and/or patient portal through her computer to conduct activities such as searching for doctors specialists and to book appointments through the website of Defendant.

136. Plaintiff S.C. was logged in to her Google account and Baptist Health portal/patient account when she searched for doctors, specialists, and booked appointments online.

137. Specifically, Plaintiff S.C. used Defendant's Website to research podiatrists and OBGYN specialists. After using Defendant's website for this purpose, Plaintiff S.C. saw online medical ads for OBGYN and podiatry-related services. The presence of these advertisements confirms Defendant's unlawful transmission of Plaintiff S.C.'s Private Information to Unauthorized Parties.

138. As Defendant's patient, Plaintiff S.C. reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted to or disclosed to Unauthorized Parties. But for her status as Defendant's patient, Plaintiff S.C. would not have disclosed her Private Information to Defendant via its Website.

51

139. At all relevant times, Plaintiff S.C. was unaware of Defendant's Tracking Tools on its Website and Defendant never disclosed to S.C. the use of such technology on Defendant's Website.

140. During her time as a patient, Plaintiff S.C. never consented to the use of her Private Information by Unauthorized Parties or to Defendant enabling Unauthorized Parties to access or intercept such information. However, Defendant's Website routinely provided Unauthorized Parties with patients' IP addresses, device IDs, persistent cookie identifiers, and/or user accounts or other information users input into Defendant's Website, like their home address, zip code, or phone number. This is precisely the type of information that HIPAA requires healthcare providers to anonymize to protect the privacy of patients. Plaintiff S.C.'s and Class Members' identities could be easily determined based on persistent cookie identifiers, IP address, and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

141. After Defendant's Tracking Tools on its Website intercepted and collected Plaintiff S.C.'s Private Information communicated to Defendant, the Tracking Tools transmitted it to the Unauthorized Parties where they processed it, analyzed it, and assimilated it into datasets. Since Plaintiff S.C. is a Google user, Google has or will associate the information that it collects

from S.C. her Google account that identifies her name and other identifying information.

142. By using the Tracking Tools to intercept Plaintiff S.C.'s communications to Defendant and then transmitting that information to Unauthorized Parties, Defendant procured Unauthorized Parties to intercept Plaintiff S.C.'s communications while accessing Defendant's Website, including the contents thereof, which encompassed the URL visited, the medical conditions and types of doctors searched, and/or other medical information related to her.

143. In sum, the Tracking Tools on Defendant's website intercepted Plaintiff S.C.'s highly sensitive communications and Private Information to Defendant and transmitted it to Unauthorized Parties, including search terms and communications that contained private and confidential information, without Plaintiff S.C.'s knowledge, consent, or express written authorization.

144. Plaintiff S.C. suffered injuries in the form of: (i) invasion of privacy; (ii) diminution of value and loss of control of her Private Information; (iii) statutory damages; (iv) the continued and ongoing risk to her Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff S.C.'s medical information and other confidential information she communicated to Defendant via the Website.

53

145.   Plaintiff S.C. has a continuing interest in ensuring that her future communications with Defendant are protected and safeguarded from future unauthorized disclosure, and she also has an interest in knowing which other unauthorized parties—aside from Unauthorized Parties—have received her Private Information since she first started using the Website.

### iii.    Plaintiff J.S.'s Experience

146.   Plaintiff J.S. is a current patient of Defendant.

147.   Plaintiff J.S. has received and paid for healthcare services from Defendant.

148.   Plaintiff J.S. has used Defendant's Website and patient portal to communicate Private Information to Defendant on numerous occasions and to receive healthcare services from Baptist facilities, at Defendant's direction, and with Defendant's encouragement.

149.   Plaintiff J.S. uses the Google Chrome internet browser on her mobile device and computer to access Baptist's Website.

150.   Plaintiff J.S. has had a Google account for several years and remained logged into that account while using Defendant's Website.

151.   Plaintiff J.S. used Defendant's Website and/or patient portal to through her mobile device to conduct activities such as: (i) search for locations, doctors, and specialties (ii) book an appointment online, and (iii) placed calls and communicated through the patient portal.

152. Plaintiff J.S. was logged in to her Google account and Baptist Health portal/patient account when she searched for locations, doctors, and specialists, communicated through the patient portal Website, and booked appointments online.

153. Specifically, Plaintiff J.S. used Defendant's Website to research specialists, treatments, and symptoms related to neurology and gastroenterology. After using Defendant's website for this purpose, Plaintiff J.S. saw medical ads online relating to neurology and gastroenterology. The presence of these advertisements confirms Defendant's unlawful transmission of Plaintiff J.S.'s Private Information to Unauthorized Parties.

154. As Defendant's patient, Plaintiff J.S. reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted to or disclosed to Unauthorized Parties. But for her status as Defendant's patient, Plaintiff J.S. would not have disclosed her Private Information to Defendant via its Website.

155. At all relevant times, Plaintiff J.S. was unaware of Defendant's Tracking Tools on its Website and Defendant never disclosed to J.S. the use of such technology on Defendant's Website.

156. During her time as a patient, Plaintiff J.S. never consented to the use of her Private Information by Unauthorized Parties or to Defendant

enabling Unauthorized Parties to access or intercept such information. However, Defendant's Website routinely provided Unauthorized Parties with patients' IP addresses, device IDs, persistent cookie identifiers, and/or user accounts or other information users input into Defendant's Website, like their home address, zip code, or phone number. This is precisely the type of information that HIPAA requires healthcare providers to anonymize to protect the privacy of patients. Plaintiff J.S.'s and Class Members' identities could be easily determined based on persistent cookie identifiers, IP address, and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

157. After Defendant's Tracking Tools on its Website intercepted and collected Plaintiff J.S.'s Private Information communicated to Defendant, the Tracking Tools transmitted it to the Unauthorized Parties where they processed it, analyzed it, and assimilated it into datasets. Since Plaintiff J.S. is a Google user, Google has or will associate the information that it collects from J.S. her Google account that identifies her name and other identifying information.

158. By using the Tracking Tools to intercept Plaintiff J.S.'s communications to Defendant and then transmitting that information to Unauthorized Parties, Defendant procured Unauthorized Parties to intercept Plaintiff J.S.'s communications while accessing Defendant's Website, including

the contents thereof, which encompassed the URL visited, the medical conditions and types of doctors searched, and/or other medical information related to her.

159. In sum, the Tracking Tools on Defendant's website intercepted Plaintiff J.S.'s highly sensitive communications and Private Information to Defendant and transmitted it to Unauthorized Parties, including search terms and communications that contained private and confidential information, without Plaintiff J.S.'s knowledge, consent, or express written authorization.

160. Plaintiff J.S. suffered injuries in the form of: (i) invasion of privacy; (ii) diminution of value and loss of control of her Private Information; (iii) statutory damages; (iv) the continued and ongoing risk to her Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff J.S.'s medical information and other confidential information she communicated to Defendant via the Website.

161. Plaintiff J.S. has a continuing interest in ensuring that her future communications with Defendant are protected and safeguarded from future unauthorized disclosure, and she also has an interest in knowing which other unauthorized parties—aside from Unauthorized Parties—have received her Private Information since she first started using the Website.

### iv. Plaintiff J.F.'s Experience

57

162. Plaintiff J.F. is a former patient of Defendant.

163. Plaintiff J.F. has received and paid for healthcare services from Defendant.

164. Plaintiff J.F. has used Defendant's Website and patient portal to communicate Private Information to Defendant on numerous occasions and to receive healthcare services from Baptist facilities, at Defendant's direction, and with Defendant's encouragement.

165. Plaintiff J.F. uses the Google Chrome internet browser on her mobile device and computer to access Baptist's Website.

166. Plaintiff J.F. has had a Google account for several years and remained logged into that account while using Defendant's Website.

167. Plaintiff J.F. used Defendant's Website and/or Patient Portal to through her mobile device to conduct activities such as: (i) search for locations, doctors, and specialties, (ii) place a call through the Website, (iii) book an appointment online, and (iv) sign into MyChart through the Website.

168. Plaintiff J.F. was logged in to her Google account and Baptist Health portal/patient account when she searched for locations, doctors, and specialists, placed a call through the Website, and booked appointments online.

169. Specifically, Plaintiff J.F. used Defendant's Website to research neurologists and cardiologists. After using Defendant's website for this purpose, Plaintiff J.F. saw medical ads online through social media

58

applications, pop-up ads, emails, etc. relating to neurology and cardiology. The presence of these advertisements confirms Defendant's unlawful transmission of Plaintiff J.F.'s Private Information to Unauthorized Parties.

170. As Defendant's patient, Plaintiff J.F. reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted to or disclosed to Unauthorized Parties. But for her status as Defendant's patient, Plaintiff J.F. would not have disclosed her Private Information to Defendant via its Website.

171. At all relevant times, Plaintiff J.F. was unaware of Defendant's Tracking Tools on its Website and Defendant never disclosed to J.F. the use of such technology on Defendant's Website.

172. During her time as a patient, Plaintiff J.F. never consented to the use of her Private Information by Unauthorized Parties or to Defendant enabling Unauthorized Parties to access or intercept such information. However, Defendant's Website routinely provided Unauthorized Parties with patients' IP addresses, device IDs, persistent cookie identifiers, and/or user accounts or other information users input into Defendant's Website, like their home address, zip code, or phone number. This is precisely the type of information that HIPAA requires healthcare providers to anonymize to protect the privacy of patients. Plaintiff J.F.'s and Class Members' identities could be

59

easily determined based on persistent cookie identifiers, IP address, and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

173. After Defendant's Tracking Tools on its Website intercepted and collected Plaintiff J.F.'s Private Information communicated to Defendant, the Tracking Tools transmitted it to the Unauthorized Parties where they processed it, analyzed it, and assimilated it into datasets. Since Plaintiff J.F. is a Google user, Google has or will associate the information that it collects from J.F. her Google account that identifies her name and other identifying information.

174. By using the Tracking Tools to intercept Plaintiff J.F.'s communications to Defendant and then transmitting that information to Unauthorized Parties, Defendant procured Unauthorized Parties to intercept Plaintiff J.F.'s communications while accessing Defendant's Website, including the contents thereof, which encompassed the URL visited, the medical conditions and types of doctors searched, and/or other medical information related to her.

175. In sum, the Tracking Tools on Defendant's website intercepted Plaintiff J.F.'s highly sensitive communications and Private Information to Defendant and transmitted it to Unauthorized Parties, including search terms

and communications that contained private and confidential information, without Plaintiff J.F.'s knowledge, consent, or express written authorization.

176. Plaintiff J.F. suffered injuries in the form of: (i) invasion of privacy; (ii) diminution of value and loss of control of her Private Information; (iii) statutory damages; (iv) the continued and ongoing risk to her Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff J.F.'s medical information and other confidential information she communicated to Defendant via the Website.

177. Plaintiff J.F. has a continuing interest in ensuring that her future communications with Defendant are protected and safeguarded from future unauthorized disclosure, and she also has an interest in knowing which other unauthorized parties—aside from Unauthorized Parties—have received her Private Information since she first started using the Website.

### F. Defendant Was Enriched and Benefited from the Use of the Tracking Tools and Unauthorized Disclosures.

178. Upon information and belief, the primary motivation and a determining factor in Defendant's interception and disclosure of Plaintiffs' and Class Members' Private Information was to commit criminal and tortious acts in violation of federal and state laws, namely, the use of patient data for advertising in the absence of express written consent for its own financial gain.

Defendant's further use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy. In exchange for disclosing the Private Information of its patients, Defendant is compensated, upon information and belief, by the Unauthorized Parties in the form of enhanced advertising services and more cost-effective marketing on its platform.

179. Retargeting is a form of online marketing that targets users with ads based on their previous online activity.

180. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients to induce more patients to use its services. Defendant did so through the use of the intercepted patient data and other Private Information it obtained, procured, and/or disclosed in the absence of express written consent.

181. By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefiting Defendant while invading the privacy of Plaintiffs and Class Members and violating their rights under federal and Kentucky law.

182. Defendant derived a benefit from producing its patients' Private Information to Unauthorized Parties through Tracking Tools, and the Unauthorized Parties specifically targeted medical-related advertisements

and/or saved key terms related to Defendant's services on users' Google accounts or other browser accounts.

183.   Thus, Defendant was unjustly enriched and benefited from the use of Tracking Tools and disclosures to Unauthorized Parties at the expense of Plaintiffs' and Class Members' privacy.

## G. Plaintiffs' and Class Members' Private Information Has Financial Value.

184.   Plaintiffs' data and Private Information have economic value. Upon information and belief, Google has recognized the value of user data and has even instituted an initiative called the "Screenwise Trends Panel," which is a pilot program in which Google pays users $3 per week to track them online.[30]

185.   Data harvesting is one of the fastest-growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data.[31] That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.[32]

---

[30]https://www.moneymakingmommy.com/screenwise-trends/ (last visited August 21, 2025)

[31] *See* https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook/

[32] *Id*.

186.   The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[33]

187.   Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[34]

188.   Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists— including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course, or something else valuable."[35]

---

[33] *See* https://time.com/4588104/medical-data-industry/ (last visited August 21, 2025)
[34] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.
[35] *See* Vero, *How to Collect Email Addresses on Twitter*, https://www.getvero.com/resources/twitter-lead-generation-cards/ (last visited Jan. 27, 2026).

64

189. There is also a market for data in which consumers can participate. Private information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect private information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

190. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, and SavvyConnect are all companies that pay for browsing historical information.

191. Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[36]

## V.    TOLLING

192. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiffs did not know (and had no way of knowing) that their Private Information was intercepted and unlawfully disclosed to

---

[36] *See* Tori Taylor, Hackers, Breaches, and the Value of Healthcare Data, SecureLink, https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

Unauthorized Parties because Defendant kept this information secret, and the Tracking Tools are invisible to users on the Website.

## VI.    CLASS ACTION ALLEGATIONS

193.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated pursuant to Fed. R. Civ. P. 23.

194.    The Classes that Plaintiffs seek to represent is defined as follows:

**Nationwide Class:**

All individuals residing in the United States who used Defendant's Website and had their Private Information, search terms, or detailed webpage information intercepted by and disclosed to third parties through the use of Tracking Tools.

**Kentucky Subclass:**

All individuals residing in Kentucky who used Defendant's Website and had their Private Information, search terms, or detailed webpage information intercepted by and disclosed to third parties through the use of Tracking Tools.

195.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; all

66

judges assigned to hear any aspect of this litigation, as well as their immediate family members; and all attorneys for Plaintiffs or Defendants, and their immediate family members.

196. Plaintiffs reserve the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

197. **Numerosity:** The Class is so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose Private Information may have been improperly disclosed via Defendant's Tracking Tools, and the Class is identifiable within Defendant's records.

198. **Commonality:** Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

   a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

   b. Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to Unauthorized Parties;

   c. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private

67

Information would be disclosed to Unauthorized Parties for marketing purposes;

d. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been divulged;

e. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

g. Whether Defendant's conduct violated the Kentucky law regarding disclosure of patient records;

h. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

i. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information

199. **<u>Typicality:</u>** Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use of Tracking Tools, due to Defendant's misfeasance.

200. **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to, and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

201. **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of Class Members in that they has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intends to prosecute this action vigorously.

202. **Superiority and Manageability:** The Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a

69

large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

203. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

70

204. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

205. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

206. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the interception of their Personal Information, and Defendant may continue to act unlawfully as set forth in this Complaint.

207. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to Class Members as a whole is appropriate.

208. *Issue Certification:* Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the Parties' interests therein. Such particular issues include, but are not limited to:

71

a. Whether Defendant has a legal duty to not disclose Plaintiffs' and Class Members' Private Information to companies that have not executed a HIPAA-compliant business associate agreement;

b. Whether Defendant has a legal duty to not disclose Plaintiffs' and Class Members' Private Information without first obtaining their express authorized consent;

c. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

d. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

e. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to Unauthorized Parties;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information communicated via its Website;

72

g. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## VII.   CAUSES OF ACTION

**COUNT I**
**VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**("ECPA")**
**18 U.S.C. § 2511(1) *et seq.***
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On behalf of Plaintiffs and the Classes)**

209.   Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

210.   The ECPA protects both sending and receipt of communications.

211.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

212.   The transmissions of Plaintiffs' Private Information to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

213.   The transmissions of Plaintiffs' Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

214. **Electronic Communications.** The transmission of Private Information between Plaintiffs and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

215. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

216. **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

217. **Electronic, Mechanical, or Other Device.** The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

　　a. Plaintiffs' and Class Members' browsers;

74

    b.  Plaintiffs' and Class Members' computing devices;

    c.  Defendant's web servers; and

    d.  The Tracking Tools deployed by Defendant to effectuate the sending and acquisition of patient communications.

218. By utilizing and embedding Tracking Tools on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

219. Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via Tracking Tools, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Private Information to Unauthorized Parties, including Google, Microsoft, and/or Adobe.

220. These intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members that contain Private Information.

221. By intentionally disclosing or endeavoring to disclose the electronic communications of the Plaintiffs and Class Members to Unauthorized Parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

222. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

223. Defendant was not acting under color of law to intercept Plaintiffs' and the Class Member's wire or electronic communication.

224. Plaintiffs and Class Members did not authorize Defendant to acquire the contents of their communications for purposes of invading Plaintiffs' privacy via the Tracking Tools.

225. Plaintiffs and Class Members did not consent to Defendant's procurement of third-party interception and sharing of their health information.

226. In intercepting and disclosing the content of Plaintiffs' and the Class members' sensitive communications and Personal Information, Defendant had a purpose that was tortious, criminal and designed to violate HIPAA and invade Plaintiff and Class Members' privacy.

227. As a direct result of Defendant's violations, Plaintiffs and Class Members are entitled to: (a) actual damages or statutory damages of $100.00 per day per violation or $10,000.00, whichever is greater; (b) punitive damages; and (c) reasonable attorneys' fees and costs under 18 U.S.C. § 2520.

## COUNT II
## BREACH OF CONFIDENCE
### (On Behalf of Plaintiffs and the Classes)

228. Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

229. Medical providers have a duty to their patients to keep non-public medical information completely confidential.

230. Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

231. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed Tracking Tools to disclose and transmit Plaintiffs' and Class Members' communications, including Private Information, to Unauthorized Parties.

232. These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

233. Plaintiffs used Defendant's Website to find medical providers, search for medical treatment, facility locations, and medical services, and communicate with Defendant regarding their health and conditions. In doing so, Plaintiffs communicated their protected health information related to their conditions to find doctors and information concerning those conditions and symptoms.

77

234. After communicating the information in the preceding paragraph, Plaintiffs began to observe related advertisements for products and/or services related to the Private Information referenced in their communications with Defendant's Website. Therefore, the information Plaintiffs shared with Defendant through its Website was not merely metadata but rather information directly related to Plaintiffs' status as Defendant's patients and to their health.

235. Defendant provided unconsented, unprivileged disclosure to Unauthorized Parties of nonpublic information that Defendant had learned within a confidential relationship with Plaintiffs.

236. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

237. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class members were damaged by Defendant's breach in that:

  a. Sensitive and confidential information that Plaintiffs and Class members intended to remain private is no longer private;

  b. Plaintiffs and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

78

    c. Defendant eroded the essential confidential nature of the provider-patient relationship;

    d. General damages for invasion of their rights in an amount to be determined by a jury;

    e. Nominal damages for each independent violation;

    f. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

    g. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

    h. Defendant's actions diminished the value of Plaintiffs' and Class Members' Private Information; and

    i. Defendant's actions violated the property rights Plaintiffs and Class Members have in their Private Information.

238. As a direct and proximate result of Defendant's breach of confidence, Plaintiffs and the Class are entitled to actual, consequential, and nominal damages and injunctive relief, with amounts to be determined at trial.

**COUNT III**
**INVASION OF PRIVACY**
**(Intrusion upon Seclusion)**

79

**(On Behalf of Plaintiffs and the Classes)**

239.  Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

240.  The Private Information of Plaintiffs and Class Members consist of private and confidential facts and information that were never intended to be shared beyond private communications.

241.  Upon information and belief, Plaintiffs and Class Members used their computers, mobile devices, and other electronic devices in their private quarters (i.e., their home and other equally private quarters).

242.  By intercepting Plaintiffs' and the Class's communications using Tracking Tools and sharing those communications with Unauthorized Parties, Defendant intruded upon Plaintiffs' and Class Members' private place, akin to an unknown actor breaking and entering into Plaintiffs' and Class Members' homes, or equally private quarters, to copy their communications and delivering it to Unauthorized Parties without Plaintiffs' and the Class's consent.

243.  Plaintiffs and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to Unauthorized Parties.

244.  Defendant owed a duty to Plaintiffs and Class Members to keep their Private Information confidential.

80

245. Defendant's surreptitious recording and intentional transmission of Plaintiffs' and Class Members' Private Information to Unauthorized Parties is highly offensive to a reasonable person.

246. Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' Private Information constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

247. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiffs' and Class Members' privacy because Defendant facilitated Unauthorized Parties' simultaneous eavesdropping and wiretapping of confidential communications.

248. Defendant failed to protect Plaintiffs' and Class Members' Private Information and acted knowingly when it installed the Tracking Tools onto its Website because the purpose of the Tracking Tools is to disseminate patient's communications with the Website for marketing and advertising as opposed to legitimate medical purposes.

249. Because Defendant intentionally and willfully incorporated the Tracking Tools and encouraged patients to use the Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

81

250. As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiffs and Class Members was disclosed to Unauthorized Parties, causing Plaintiffs and the Class to suffer damages.

251. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information is still maintained by Defendant and still in the possession of the Unauthorized Parties and the wrongful disclosure of the information cannot be undone.

252. Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to the Unauthorized Parties who, upon information and belief, continue to possess and utilize that information.

253. Plaintiffs, on behalf of themselves and Class Members, seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

## COUNT IV
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Classes)

254. Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

82

255.   Defendant benefits from the use of Plaintiffs' and Class Members' Private Information and unjustly retained those benefits at their expense.

256.   Plaintiffs and Class Members provided their Private Information to Defendant in exchange for medical services. Plaintiffs and Class Members used Defendant's Website to search for specific medical information relating to Defendant's medical services without knowledge that Plaintiffs' and Class Members' Private Information would be intercepted by Defendant's Tracking Tools and disseminated to Unauthorized Parties who used such information to target advertisements to Plaintiffs and Class Members.

257.   Plaintiffs and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiffs and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

258.   Plaintiffs' and Class Members' Private Information have economic value.

259.   Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

260. The benefits that Defendant derived from Plaintiffs and Class Members were not offered by Plaintiffs and Class Members gratuitously and rightly belongs to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles in Kentucky and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

261. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## COUNT V
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiffs and the Classes)

262. Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

263. A contract implied in fact is one form of an enforceable contract; it is based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words.

264. As a condition of utilizing Defendant's digital platforms and receiving medical services from Defendant, Plaintiffs and the Class provided their Private Information and compensation for their medical care.

84

265. When Plaintiffs and Class Members provided their Private Information to Defendant, they entered into implied contracts pursuant to which Defendant agreed to safeguard and not disclose Plaintiffs' and the Class's Private Information without consent or authorization.

266. Plaintiffs and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

267. Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Private Information to Unauthorized Parties. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

268. Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against Defendant as follows:

1. An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the

undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

2. An order for equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

3. An order for injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

4. A judgement in favor of Plaintiffs and the Class awarding them damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

5. A judgment in favor of Plaintiffs and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

6. An award of such other and further relief as this Court may deem just and proper.

## IX.   DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated: April 22, 2026          Respectfully submitted,

/s/ Joseph M. Lyon
Joseph M. Lyon
**The Lyon Firm, ALC**
2754 Erie Ave.
Cincinnati, OH 45208
Telephone: (513) 381-2333
Email: jlyon@thelyonfirm.com


William B. Federman*
Jessica A. Wilkes*
**Federman & Sherwood**
10205 N. Pennsylvania Ave
Oklahoma City, OK 73120
Telephone: (405) 235-1560
E: wbf@federmanlaw.com
E: jaw@federmanlaw.com

Don Bivens*
Maxwell K. Weiss*
**Don Bivens, PLLC**
15169 N. Scottsdale Road, Suite 205
Scottsdale, Arizona 85254
Telephone: (602) 762-2661
E: don@donbivens.com
E: max@donbivens.com


*Attorneys for Plaintiffs*
*and Proposed Class*

***Pro Hac Vice Forthcoming***

87